UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

KEVIN JAMES LISLE,

    Petitioner,

    v.

WILLIAM GITTERE, *et al.*,

    Respondents.

Case No. 2:03-cv-01005-JCM-DJA

**ORDER**

## I.   Introduction

This action is a petition for a writ of habeas corpus by Kevin James Lisle, a Nevada prisoner sentenced to death. The case is fully briefed and before the Court for resolution of Lisle's motion for an evidentiary hearing and adjudication of the merits of the claims remaining in his third amended habeas petition. The Court will deny Lisle's motion for an evidentiary hearing, deny Lisle's third amended habeas petition, and grant Lisle a certificate of appealability with respect to certain issues.

## II.   Background

At issue in this case, are Lisle's conviction and sentence for the murder of Kip Logan in Las Vegas on October 22, 1994. In its opinion on Lisle's direct appeal, the Nevada Supreme Court described the factual background as follows:

> On the evening of October 22, 1994, Joey Gonzales and Kip Logan bought two beers and then headed towards Logan's girlfriend's house. As Logan drove on U.S. Interstate Highway 95, a white van approached his Mustang. Gonzales observed the van's front passenger stick his head and arm out of the window and scream at them. Gonzales told Logan, "Let's just go," and took a swig of his beer. At that moment, Gonzales heard the driver-side window break. He turned and saw Logan slumped over the steering wheel. Gonzales grabbed the steering wheel and stopped the Mustang.

Metro police officer Steve Borden and his partner, Mike Carreia, arrived as Gonzales was pulling Logan out of the Mustang. Officer Borden saw that Logan had been shot in the head. He checked Logan for vital signs, and saw none.

Gonzales told Borden that he saw three males in an Aerostar-type van, Hispanic or white, with shaved heads. Gonzales said that the shooter had a goatee, and that the back-seat passenger appeared more white.

On the next day, a medical examiner determined that Logan had died of a gunshot wound to his head. Fragments of a bullet consistent with a .357 Magnum were removed from Logan's head.

On the same day, John Melcher was arrested. He denied being in the van on the previous night.

On October 27, 1994, Anthony Evans was arrested. That evening, he gave a statement that Melcher was in the front passenger seat of the van, and that the shot came from the front passenger side. He said that after the shooting, "Shotgun" (Melcher) disposed of the gun.

On October 31, 1994, the defendant, Kevin James Lisle, was arrested.

On April 6, 1995, Evans agreed to testify against Lisle and Melcher in exchange for the State reducing his charges to accessory after the fact of murder. Evans agreed to testify both in the Logan case and in another homicide case involving Lisle ("the Lusch case"). On May 23, 1995, Evans was released from custody.

Sometime after Evans agreed to cooperate with the State, Melcher sought the same deal. On July 24, 1995, he was interviewed by detectives. His charges were later reduced to accessory after the fact of murder. His case was transferred to juvenile court and he received probation.

On October 9, 1995, an amended indictment was filed charging Lisle with one count of murder with use of a deadly weapon and one count of attempted murder with use of a deadly weapon. A jury trial commenced on October 16, 1995.

Guilt phase

At trial, Evans testified that on the night of October 22, 1994, he, Melcher, and Lisle were at Larry Prince's apartment. Evans, Melcher, and Lisle decided to borrow a white van from Prince, and Melcher picked up the keys to the van. As Lisle got into the front passenger seat of the van

2

1

he said, "I hope nobody messes with us tonight, because I'm drunk and I do crazy things when I'm drunk." Lisle was holding a .357 handgun.

2

3

Evans testified that Melcher drove the van, Lisle was in the front passenger seat, and he was in the rear passenger seat. Lisle was hanging out the window and throwing gang signs at cars. Evans heard Lisle tell Melcher, "speed up," and the van pulled up to a Mustang. Evans observed Lisle pull out his gun and point it out of the window, and then Evans heard a gunshot and saw sparks fly. Evans then saw the Mustang pull over to the side of the road, saw that the Mustang's driver-side window was shattered, and saw the driver laying against the steering wheel. Evans stated that he did not know whether there was anyone else in the Mustang besides the driver. Evans testified that after the gunshot, Lisle directed Melcher to get off the freeway and to stop the van. Lisle then disposed of the gun.

4

5

6

7

8

9

10

On redirect, Evans testified that he was a member of the North Hollywood Boyz, and Lisle was a member of the Westside Lompoc, both California gangs. He stated that he had known Lisle for two years and Melcher for two months. He stated that Melcher was not a gang member. Evans said that gang members have a rule "not to tell on none of your friends." He testified that he was afraid of Lisle.

11

12

13

14

Prince testified that while living in Las Vegas, he became familiar with Evans, Melcher and Lisle. He stated that he had rented a van for their use, and that Lisle drove it more than anyone else. Prince admitted that he testified in this case pursuant to a plea bargain on a drug possession charge.

15

16

17

The grand jury testimony of Tom Foster was read. On the night of the shooting, Foster observed three males exit from a white van. Foster testified that he was positive that Lisle was the driver of the van. Foster identified Melcher as a passenger.

18

19

20

Detective Diane Falvey testified that on the day of Evans' arrest he had indicated that Melcher was the shooter, but she suspected he was not giving the right information. Detective Donald Tremel testified that when Melcher was arrested, Melcher told him that Lisle was driving the van.

21

22

23

Melcher testified that he had no gang affiliation. He stated that he did things for Lisle, such as "drive the car around," in exchange for clothes and money. Melcher stated that on the evening of October 22, 1994, he was driving the white van on the freeway.

24

25

26

Melcher testified that while he was in custody, he saw Lisle at the detention center. Lisle told him "that he looked Logan in the eye before he killed him and he enjoys it and that after I do my first one I will see what he is talking about." Lisle also told him that the police believed Melcher was

27

28

3

the shooter, and told him to take the blame for the shooting. Melcher stated that he was aware of the gang code of conduct, "if you snitch, you die," and that he had been afraid of retaliation.

Melcher also testified that he could not grow a beard.

Sophia Martinez testified that at approximately 3:00 a.m. on October 23, 1994, Lisle told her that he had done something crazy, and to watch the news. At that time, Lisle had a mustache but no hair on his chin. She had never seen Melcher with a mustache or a goatee. She saw Lisle with a shaved face later that day.

Christopher Barnes, testifying for the defense, stated that after hearing about the shooting he contacted the police, because he had been assaulted by individuals of a similar description. He identified a photograph of Melcher as one of his assailants. However, he acknowledged that although he had believed his assailant had lighter skin than himself, Melcher's skin was darker than his. He was shown a photo of Lisle but did not recognize him as having been involved in the incident. He described his assailant as having "a little bit of rough around the chin and the moustache," what he would call a goatee.

David Hermanson, Melcher's cellmate, stated that Melcher had admitted to him that he was trying to shoot the passenger but missed and hit the driver.

On October 20, 1995, the jury returned a verdict of guilty for both the murder and the attempted murder charges.

Penalty phase

On October 24, 1995, the State filed its intent to seek the death penalty based on the aggravating circumstance that the murder was committed by a person who knowingly created a risk of death to more than one person by means of a weapon, device, or course of action that would normally be hazardous to the lives of more than one person. The district court granted Lisle's motion for a mistrial on attempted murder, but denied a motion for mistrial for the murder charge.

During the penalty phase, several witnesses implicated Lisle in the Lusch case.

On October 26, 1995, the jury returned a sentence of death. On February 1, 1996, the judgment of conviction and a warrant of execution were filed.

4

1   *Lisle v. State*, 113 Nev. 540, 544–47, 937 P.2d 473, 475–77 (1997) (order filed as Exh.

2   73 (ECF No. 219-12)).

3          In a separate case in this Court, Case No. 2:03-cv-1006-MMD-DJA, Lisle petitions

4   for a writ of habeas corpus with respect to his conviction and death sentence for the Lusch

5   murder.

6          In this case, regarding the Logan murder, the judgment of conviction was entered

7   on February 1, 1996. *See* Judgment of Conviction, Exh. 67 (ECF No. 219-6). Lisle

8   appealed to the Nevada Supreme Court, and the Nevada Supreme Court affirmed on

9   April 24, 1997. *See* Appellant's Amended Opening Brief, Exh. 70 (ECF No. 219-9); *see*

10  *also Lisle*, 113 Nev. 540, 937 P.2d 473. The Nevada Supreme Court denied Lisle's

11  petition for rehearing but issued an order clarifying its ruling on one issue. *See* Order

12  Denying Rehearing, Exh. 75 (ECF No. 219-14); *Lisle v. State*, 114 Nev. 221, 954 P.2d

13  744 (1998). Lisle petitioned the United States Supreme Court for certiorari; the petition

14  was denied on October 5, 1998. *See* Opinion, Exh. 76 (ECF No. 219-15); *Lisle v. State*,

15  525 U.S. 840 (1998).

16         Lisle filed a *pro se* petition for writ of habeas corpus in the state district court on

17  November 9, 1998. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 78

18  (ECF No. 219-17). Counsel was appointed, and, with counsel, Lisle filed a supplement

19  to his petition on July 26, 2000. *See* Supplemental Points and Authorities, Exh. 84 (ECF

20  No. 219-23). The state district court denied the petition on October 30, 2000. *See*

21  Findings of Fact, Conclusions of Law and Order, Exh. 91 (ECF No. 220). Lisle

22  appealed, and the Nevada Supreme Court affirmed on August 21, 2002. *See*

23  Appellant's Opening Brief, Exh. 99 (ECF No. 220-8); Order of Affirmance, Exh. 103

24  (ECF No. 220-12).

25         Lisle initiated this action by filing a petition for writ of habeas corpus in this Court

26  on August 20, 2003 (ECF No. 1). Lisle's original petition was signed on his behalf by

27  counsel.  However, Lisle requested appointment of counsel by the Court, and the Court

28  appointed the Federal Public Defender for the District of Nevada (FPD) to represent him

1   (ECF Nos. 2, 4, 6). Lisle then filed a motion for leave to conduct discovery (ECF No.

2   41), and discovery proceedings ensued.

3          On April 15, 2008, Lisle filed a first amended habeas petition (ECF No. 122). On

4   June 2, 2008, Lisle filed a motion for leave to file a second amended petition (ECF No.

5   128); that motion was granted on July 8, 2008, and the second amended petition was

6   filed on that date (ECF Nos. 131, 132).

7          On April 15, 2008, when he filed his first amended petition, Lisle filed a motion for

8   stay and abeyance (ECF No. 120). Respondents did not oppose that motion, and on

9   July 8, 2008, the case was stayed to allow Lisle to exhaust claims in state court (ECF

10  No. 131).

11         On August 25, 2008, Lisle filed a second state habeas petition. *See* Petition for

12  Writ of Habeas Corpus (Post-Conviction), Exh. 108 (ECF Nos. 220-17, 220-18); *see*

13  *also* Amended Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 121 (ECF

14  Nos. 221-2, 221-3, 221-4); Second Amended Petition for Writ of Habeas Corpus (Post-

15  Conviction), Exh. 136 (ECF Nos. 221-26, 221-27, 221-28). The state district court

16  dismissed that petition on procedural grounds on November 20, 2009. *See* Findings of

17  Fact, Conclusions of Law and Order, Exh. 140 (ECF No. 221-32). Lisle appealed, and

18  the Nevada Supreme Court affirmed on June 25, 2015. *See* Order, Exh. 169 (ECF No.

19  222-23); *Lisle v. State*, 351 P.3d 725 (Nev. 2015). The Nevada Supreme Court denied

20  rehearing on October 22, 2015. *See* Order Denying Rehearing, Exh. 173 (ECF No. 222-

21  27). The United States Supreme Court denied certiorari on May 16, 2016. *See* Letter,

22  Exh. 179 (ECF No. 222-33).

23         The stay of this case was lifted, upon a motion by Lisle, on June 22, 2016 (ECF

24  No. 191). On October 21, 2016, Lisle filed a third amended petition for writ of habeas

25  corpus (ECF No. 197), which is now his operative petition. The Court reads Lisle's third

26  amended petition to assert the following claims:

27

28

1.     Lisle's conviction and death sentence violate the federal constitution "because, in light of new evidence not presented at trial, it is more likely than not that no reasonable juror, properly instructed, would have found him guilty beyond a reasonable doubt … and/or he can make a truly persuasive demonstration that he is factually innocent of the offense." Third Amended Petition (ECF No. 197), pp. 14–34.

2.     Lisle's conviction and death sentence violate the federal constitution "because prosecutorial misconduct and the State's failure to disclose material exculpatory and impeachment evidence deprived Mr. Lisle of fundamentally fair proceedings." *Id.* at 35.

    A.     "The State failed to disclose material impeachment evidence and failed to correct false testimony." *Id.*

        1.     "The State failed to disclose exculpatory and impeachment materials regarding John Melcher." *Id.* at 36–44.

        2.     "The State failed to disclose impeachment materials regarding Larry Prince." *Id.* at 44–49.

        3.     "The State failed to disclose impeachment evidence regarding Adam Evans." *Id.* at 49–50.

        4.     "The State failed to disclose the existence of cash payments to its witnesses." *Id.* at 50–53.

        5.     "The prosecutor misled trial counsel by claiming that his office maintained an open file policy." *Id.* at 54–56.

    B.     "The State committed misconduct throughout the trial." *Id.* at 56.

        1.     "The State made improper comments and argument during its opening statement." *Id.* at 57–58.

        2.     "The State committed misconduct during its closing argument." *Id.* at 58.

            a.     "The State improperly aligned itself with the jury." *Id.* at 58–59.

            b.     "The State improperly vouched for the credibility of Mr. Evans and Mr. Melcher." *Id.* at 59–62.

     c. "Improperly commenting upon the lack of mitigating evidence and the role of mitigating circumstances." *Id.* at 62–63.

3. Lisle's conviction and death sentence violate the federal constitution "because the State committed prosecutorial misconduct in presenting testimony that improperly bolstered its witnesses; the trial court erred in failing to strike that testimony; and trial counsel provided ineffective assistance in failing to object to that testimony, move to strike that testimony, and move for a mistrial following the jury's exposure to that testimony." *Id.* at 65–77.

4. Lisle's conviction and death sentence violate the federal constitution "because the prosecutor prevented the defense from speaking with John Melcher and the trial court did not afford petitioner a hearing on his allegations." *Id.* at 78–82.

5. Lisle's conviction and death sentence violate the federal constitution "because Mr. Lisle's attorneys were constitutionally ineffective at all stages of his state-court proceedings." *Id.* at 83.

  A. "Trial counsel were ineffective for failing to present available mitigating evidence at the penalty phase." *Id.* at 83–129.

  B. "Trial counsel performed ineffectively during the guilt phase." *Id.* at 129.

    1. "Failure to investigate and present evidence of actual innocence of first-degree murder." *Id.* at 129–32.

    2. "Ineffective litigation of gang allegations in the guilt phase." *Id.* at 132–42.

    3. "Ineffective cross-examination of Larry Prince." *Id.* at 142–55.

    4. "Ineffective cross-examination of John Melcher." *Id.* at 155–57.

    5. "The institutional lack of resources at the office of the Clark County Public Defender." *Id.* at 158–59.

  C. "Trial counsel failed to object to prosecutorial misconduct." *Id.* at 159–60.

  D. "Trial counsel failed to object to erroneous jury instructions and failed to request necessary jury instructions." *Id.* at 160–61.

6.      Lisle's conviction and death sentence violate the federal constitution "due to the invalid instructions defining first-degree murder which removed the distinguishing elements of the offense from the jury's consideration and rendered the instructions unconstitutionally vague." *Id.* at 163–73.

7.      Lisle's death sentence violates the federal constitution "because the knowing risk of death aggravating circumstance has been unconstitutionally applied to Mr. Lisle's case." *Id.* at 174–80.

8.      Lisle's conviction and death sentence violate the federal constitution "because cumulative errors in Mr. Lisle's proceedings deprived him of fundamental fairness throughout the proceedings." *Id.* at 181–82.

9.      Lisle's conviction and death sentence violate the federal constitution "due to direct appeal counsel's failure to provide reasonably effective assistance." *Id.* at 183–87.

10.     Lisle's conviction and death sentence violate the federal constitution "because the trial court committed numerous substantial and injurious errors during the guilt- and penalty-phase proceedings." *Id.* at 188.

    A.      "The trial court erroneously allowed the State to present prejudicial evidence of an unadjudicated homicide." *Id.* at 188–90.

    B.      "The trial court erroneously admitted hearsay evidence in violation of Lisle's confrontation rights." *Id.* at 190–95.

    C.      "The trial court erred by failing to continue Mr. Lisle's arraignment despite the fact that he had not been given a timely copy of the grand jury proceedings." *Id.* at 195–96.

    D.      "The State failed to provide Mr. Lisle with adequate notice of the grand jury proceedings." *Id.* at 197–201.

11.     Lisle's conviction and death sentence violate the federal constitution "because the trial court erroneously instructed the jury in the guilt- and penalty-phase proceedings." *Id.* at 202.

    A.      "The reasonable doubt instruction." *Id.* at 202–04.

    B.      "Guilt phase instructions." *Id.* at 204.

        1.      "The premeditation and deliberation instruction." *Id.* at 204.

        2.      "The malice instructions." *Id.* at 204–07.

    C.      "Penalty phase instructions." *Id.* at 207.

        1.      "The anti-sympathy instruction." *Id.* at 207–08.

2.      "The limited use of prior bad act evidence and failure to instruct the jury that the other murder offense had to be found beyond a reasonable doubt." *Id.* at 208–12.

3.      "The failure to require that mitigation evidence must be outweighed by statutory aggravating circumstances beyond a reasonable doubt." *Id.* at 212–13.

12.     Lisle's conviction and death sentence violate the federal constitution "because systemic errors in jury selection infected the voir dire proceedings." *Id.* at 214.

A.      "The State used peremptory challenges in a racially discriminatory manner." *Id.* at 215–21.

B.      "The trial court failed to remove for cause biased jurors Koch, Mode, and Chandler from the venire." *Id.* at 221–22.

C.      "The trial court improperly limited the voir dire proceedings." *Id.* at 223–25.

D.      "The trial court erred by limiting voir dire to questions not contained in the written questionnaires in order to rush the voir dire proceedings." *Id.* at 225–27.

E.      "The trial court erred in conducting voir dire on the unconstitutional theory that a prospective juror had to be able to 'equally consider' death as a punishment." *Id.* at 227–29.

F.      "The trial court failed to record critical parts of voir dire." *Id.* at 230–31.

G.      "Mr. Lisle was deprived of the effective assistance of counsel during the voir dire proceedings." *Id.* at 231–32.

1.      "Trial counsel failed to rehabilitate death-scrupled jurors." *Id.* at 232–35.

2.      "Trial counsel failed to object for cause to biased jurors." *Id.* at 235–38.

3.      "Trial counsel were ineffective for using peremptory strikes to remove biased jurors who should have been challenged for cause." *Id.* at 238–40.

4.      "Trial counsel ineffectively litigated the *Batson* issue." *Id.* at 240–41.

> 5.  "Trial counsel were ineffective in failing to object to the misleading voir dire and question on the questionnaire regarding 'equal consideration" of the death penalty." *Id.* at 241.

13.  Lisle's conviction and death sentence violate the federal constitution "due to the failure of the Nevada Supreme Court to conduct fair and adequate appellate review." *Id.* at 243.

> A.  "The Nevada Supreme Court's mandatory review of death sentences for arbitrariness is itself arbitrary and capricious." *Id.* at 243–46.

> B.  "The Nevada Supreme Court's appellate review in Lisle's case was arbitrary and capricious." *Id.* at 246–50.

14.  Lisle's conviction and death sentence violate the federal constitution "because severe mental illness rendered Mr. Lisle incompetent to stand trial." *Id.* at 251–60.

15.  Lisle's conviction and death sentence violate the federal constitution "because he may become incompetent to be executed." *Id.* at 261.

16.  Lisle's conviction and death sentence violate the federal constitution "because severe mental and physical illness rendered him incompetent" during his proceedings, and "Lisle's maltreatment while incarcerated results in his execution being unconstitutional." *Id.* at 262–84.

17.  Lisle's conviction and death sentence violate the federal constitution "because Mr. Lisle was forced to wear a stun belt and shackles during the guilt and penalty phases of his trial." *Id.* at 285–87.

18.  Lisle's federal constitutional rights were violated "because Mr. Lisle's capital trial, sentencing, and review on direct appeal were conducted before state judicial officers whose tenure in office was not during good behavior but whose tenure was dependent on popular election." *Id.* at 288.

> A.  "The system of electing judges in the State of Nevada carries an unconstitutional risk of bias. *Id.* at 288–96.

> B.  "The actions of the trial court in Lisle's case demonstrate an unconstitutional risk of judicial bias." *Id.* at 296–300.

19.  Lisle's federal constitutional rights were violated "because Mr. Lisle's attorneys failed to object to the admission of evidence during the penalty phase of his trial which recounted events that did not result in a criminal conviction and that occurred before Mr. Lisle reached the age of eighteen." *Id.* at 301–04.

20.  Lisle's death sentence is invalid under the federal constitution "because the Nevada capital punishment system operates in an arbitrary and capricious manner." *Id.* at 305–08.

11

21.     Lisle's death sentence is invalid under the federal constitution "because his execution by lethal injection violates the constitutional prohibition against cruel and unusual punishments and his rights under the First and Fourteenth Amendments." *Id.* at 309.

> A.     "Lethal injection is unconstitutional in all circumstances." *Id.* at 309–18.
>
> B.     "Lethal injection in Nevada is unconstitutional." *Id.* at 318–35.

On March 20, 2017, respondents filed a motion to dismiss (ECF No. 216). On August 14, 2017, Lisle's counsel--the FPD—filed an ex parte motion to withdraw or for appointment of separate counsel (ECF No. 243 (sealed)), informing the court that they had a conflict with respect to a potential argument for equitable tolling in response to Respondents' assertion of the statute of limitations defense. The Court denied the FPD's motion to withdraw but appointed separate counsel to assert the equitable tolling argument (ECF Nos. 246, 247 (sealed)). Lisle's separate counsel filed a memorandum of supplemental argument (ECF No. 252). The Court ruled on the motion to dismiss on July 2, 2018. *See* Order entered July 2, 2018 (ECF No. 260). The Court granted the motion in part and denied it in part; the Court dismissed all of Lisle's claims except: Claim 2B2a; Claim 2B2b; the claims in Claim 5C that trial counsel were ineffective for failing to object to the prosecutorial misconduct alleged in Claims 2B2a and 2B2b; Claim 7; Claim 8; Claim 10A; Claim 15; and Claim 21B. *See id.*

Respondents filed an answer on November 15, 2018, responding to Lisle's remaining claims (ECF No. 263). On April 26, 2019, Lisle filed a reply (ECF No. 271), along with a motion for an evidentiary hearing (ECF No. 273). On July 10, 2019, Respondents filed a response to Lisle's reply (ECF No. 276), and a response to Lisle's motion for an evidentiary hearing (ECF No. 277). On July 30, 2019, Lisle filed a reply to the response to his motion for an evidentiary hearing (ECF No. 278).

The Court stayed this action on October 7, 2020, pending the resolution of a motion by Lisle in his other federal habeas action, Case No. 2:03-cv-1006-MMD-DJA, to waive further proceedings and voluntarily dismiss that action (ECF No. 281). Lisle

1   ultimately withdrew that motion, and on November 30, 2020, the stay of this action was

2   lifted (ECF No. 283).

3        On January 29, 2021, Lisle filed a motion for reconsideration (ECF No. 288),

4   requesting that the Court reconsider the order entered July 2, 2018 (ECF No. 260), in

5   light of *Ross v. Williams*, 950 F.3d 1160 (9th Cir. 2020) (en banc). The Court denied the

6   motion for reconsideration on May 21, 2021 (ECF No. 291).

7        The case is now before the Court for resolution of Lisle's motion for evidentiary

8   hearing and adjudication of his remaining claims on their merits.

9   **III.   Discussion**

10      **A.   Standard of Review**

11       Because this action was initiated after April 24, 1996, the amendments to

12  28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act

13  (AEDPA) apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*,

14  212 F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by *Lockyer v. Andrade*,

15  538 U.S. 63 (2003). 28 U.S.C. § 2254(d) sets forth the primary standard of review under

16  the AEDPA:

17          An application for a writ of habeas corpus on behalf of a person in
            custody pursuant to the judgment of a State court shall not be granted with
18          respect to any claim that was adjudicated on the merits in State court
            proceedings unless the adjudication of the claim —
19
            (1)  resulted in a decision that was contrary to, or
20          involved an unreasonable application of, clearly established
            Federal law, as determined by the Supreme Court of the
21          United States; or

22          (2)  resulted in a decision that was based on an
            unreasonable determination of the facts in light of the
23          evidence presented in the State court proceeding.

24  28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme

25  Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court

26  applies a rule that contradicts the governing law set forth in [the Supreme Court's]

27  cases" or "if the state court confronts a set of facts that are materially indistinguishable

28  from a decision of [the Supreme Court] and nevertheless arrives at a result different

from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (*quoting Williams*, 529 U.S. at 409). The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has also instructed that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

Where the state court summarily denied a claim without discussion of the claim, a presumption exists that the state court adjudicated the claim on the merits, unless "there is reason to think some other explanation for the state court's decision is more likely." *Harrington*, 562 U.S. at 99–100. In that case, a reviewing federal court "must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could

disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102.

### B.     Claims 2B2a, 2B2b and 5C

In Claims 2B2a and 2B2b, Lisle claims that his federal constitutional rights were violated because of prosecutorial misconduct in the State's closing arguments, because the prosecution improperly aligned itself with the jury (Claim 2B2a) and because the prosecution improperly vouched for the credibility of witnesses Anthony Evans and John Melcher (Claim 2B2b). Third Amended Petition (ECF No. 197), pp. 58–62. In the remaining part of Claim 5C, Lisle claims that his trial counsel were ineffective for failing to object to this alleged prosecutorial misconduct. *Id.* at 159–60; *see also* Order entered July 2, 2018 (ECF No. 260), pp. 34–36.

Lisle claims, in Claim 2B2a, that the prosecutor improperly aligned himself with the jury in his closing argument in the guilt phase of Lisle's trial by repeatedly using plural pronouns such as "we" and "us." *See* Third Amended Petition (ECF No. 197), pp. 58–59. Lisle points to the following passage from the prosecution's guilt-phase closing argument:

> I don't, like I said, [sic] *we* ought to spend a lot of time discussing the gang issue because I don't think it's anything that any of *us* could fully understand anyway. None of *us* are in gangs. None of *us* have lived the gang lifestyle. If you all know people in gangs and you know something commonsensical about it, then that's fine, but don't speculate anything about games—gangs, excuse me.

*See id.* (quoting Trial Transcript, October 19, 1995, Exh. 40, p. 121 (ECF No. 218-5, p. 122)) (emphasis and "[sic]" as in quotation in third amended petition). Lisle also claims that the prosecutor improperly aligned himself with the jury in rebuttal argument in the penalty phase of the trial, in the following argument:

> What mitigation could they possibly put in front of you that would [outweigh] that? The things that you've heard, the excuses for who this person has become, and that's all it is. Is that what they're trying to do?
>
> Well, *let's* help them out here. Mitigation, and I know some of you can't see this, the picture of Kevin Lisle and his sister, I don't believe that has been shown to you before. The picture of a little boy being put in a

corner and punished assumably for having done something wrong. A picture of a child who *we* were told was brutally treated by having urine filled diapers pulled over his head, you tell me, does it look a little playful in this picture which was saved over the years?

That is what *we* have in front of *us* which forms the genesis of the mitigation, the poor Kevin, the it's somebody else's fault that you did what you did. And what do *we* have on the other side of that coin? *We* have the two dead bodies that that person caused. That man sitting over there— excuse me, in the chair between the two lawyers. And they want mercy. They want mercy for an individual who has done that?

*See* Third Amended Petition (ECF No. 197), p. 59 (quoting Trial Transcript, October 25, 1995, Exh. 47, pp. 346–47 (ECF No. 218-12, pp. 148–49)) (first two paragraphs added for context (emphasis and correction added); emphasis in third paragraph as in third amended petition).

Lisle also claims that the prosecutor improperly aligned himself with the jury in rebuttal argument in the penalty phase of the trial, in making the following argument:

And your accountability has got to take note of that man's responsibility. Not yours. There is only one human being in this world that causes *us* to be here today doing this terrible thing [that] *we* have to do. And his name is Kevin Lisle.

*See* Third Amended Petition (ECF No. 197), p. 58 (quoting Trial Transcript, October 25, 1995, Exh. 47, p. 350 (ECF No. 218-12, p. 152)) (first two sentences added for context (emphasis and correction added)).

In Claim 2B2b, Lisle claims that the prosecution improperly vouched for two of its witnesses, Anthony Evans and John Melcher, in the following passage from the prosecution's closing argument in the guilt phase of the trial:

Now, I'll leave the bulk of Adam [Evans's] and John's [Melcher's] testimony to Mr. Seaton, but one thing I do want to talk about is their deals, quote, unquote, that they got. The defense harped a lot on the deals that Adam and John got. And it kind of relates back to when I was saying that the accomplice jury instruction is not applicable here. You look at it from what Adam and John did that night and think about what they were really guilty of [sic].

*See* Third Amended Petition (ECF No. 197), p. 60 (quoting Trial Transcript, October 19, 1995, Exh. 40, p. 132 (ECF No. 218-5, p. 133)) (entire paragraph included for context (corrections as in third amended petition)). Lisle claims that the other prosecutor,

1    Seaton, then improperly vouched for Evans and Melcher in making the following

2    arguments in his rebuttal argument:

3            This case is remarkably easy. It really boils down very simply who
       was in the passenger seat. Who did the shooting? Goatees and bald
4       heads and looking left and everything else aside, what you folks do as a
       jury is the opposite side of the coin of what the judge does. He decides the
5       law. He read to you the instructions. You decide the facts. He doesn't get
       to say anything about the facts. We don't get to say anything about the
6       facts except to present them as best we can. You and the words of the law
       are the sole arbiters of the facts. Nobody can take that away from you.
7       And that's why that witness chair is up there and that is why Adam Evans
       and John Melcher, two kids who have been ridiculed here in this
8       courtroom this afternoon, sat in this chair so that you could observe them.

9            He says it's easier to sit in that chair than that chair. Well, from a
       consequences point of view perhaps so, but can you imagine at age 14
10      and 16, that area of age, coming in here in front of all of us adults and
       saying the things that you gotta say. Particularly—well, that creates a fear
11      among any witness and you probably shared it to some limited extent
       when you were witnesses and we asked you questions and you had to
12      answer them, you were under oath, you just sat in a different chair. Think
       of the 14-year-old who's got to sit in that chair in front of we adults and do
13      that.

14           They talk a lot about negotiations. Let's get one thing straight right
       now. There was one person in this courtroom that had to do with all of
15      those negotiations and he's talking to you right now. I was that person and
       that pretty well came out. Think of the case as it started. A van has had a
16      shot come out of it and kills a young boy in a van—in a Mustang. It comes
       to light who the three people are who occupy that van and yet there is not
17      certainty about who the person was who did the shooting. Probably the
       best thing that is known and this admittedly is using hindsight, is that
18      Adam Evans is the one who didn't have anything to do with it. Never,
       except for this charade of him calling himself a killer if that's what he did,
19      has anyone pointed the finger at Adam Evans and said you were the
       shooter and we are accusing you of that. Didn't happen.
20
             That is who the District Attorney's office as presented by me at the
21      time went to and talked to first. Mr. Skupa told me the one interest that I
       have, that the District Attorney's office had was who was the shooter. I
22      think we probably all would agree in this room that there was one shooter
       and two people who were surprised, but who aided afterwards. Those
23      people, those two people are not guilty of any crime of murder. And it
       would be morally reprehensible to take them to trial once that is learned,
24      which is just what happened in this case.

25           Adam Evans knew that he had to tell a story to me that comported
       with the facts, that lined up with what we already knew, and he didn't know
26      all of what we already knew. And the evidence shows that the State of
       Nevada came away satisfied that he had done that and that he had given
27      a true story. And that now we can proceed with the case in a little different
       light. He would be removed from it because he was one of the two people
28

17

1   who it would be morally repugnant for us to go after if things are as we
    suspect.

2        He in that statement to the officers and his conversations with me
3   named that man as being the shooter. And he said he did it—he said—he
    said the first statement that it was Melcher because he feared that man
4   and if you watched Debbie Vanella for the tics and twitches and things I
    was just talking about, you read fear in that woman's face and in her
5   words. She has a gang son, and she knows all about gangs and
    retaliation. And you bet she's afraid to come in here and tell you the entire
6   truth.

7        So, Melcher, according to Adam Evans is the driver. And the State
    talks to Adam—to John Melcher under precisely the same terms that the
8   State spoke with Adam Evans. I know many things at that time that John
    Melcher doesn't know, particularly the statement of Adam Evans. And
9   you've been around here for a few days, think in your own mind what my
    response would have been had John Melcher's story not been at least
10  very close to the story of Adam Evans. We don't expect perfection.
    Nobody can tell the same story the same way twice. No two people. And
11  that's why we're here today in the position that we're in. That is the truth of
    these proceedings.

12  *Id.* at 60–61 (quoting Trial Transcript, October 19, 1995, Exh. 40, pp. 179–82 (ECF No.

13  218-5, pp. 180–83)) (additional argument quoted for context).

14      On his direct appeal, Lisle claimed that the prosecution committed misconduct as

15  asserted in these claims. *See* Appellant's Amended Opening Brief, Exh. 70, pp. 59–63

16  (ECF No. 219-9, pp. 73–77). The Nevada Supreme Court ruled as follows:

17      *Whether the defendant was denied a fair trial due to repeated improper
        comments to the jury by the prosecutors.*
18

19           Lisle argues that the prosecutors made prejudicial remarks to the
        jury during both the guilt and the penalty phases of trial, in violation of his
20      right to due process. Lisle did not object to the remarks at trial, except for
        statements concerning his drug use. "As a general rule, the failure to
21      object, assign misconduct, or request an instruction, will preclude
        appellate consideration. However, where the errors are patently prejudicial
22      and inevitably inflame or excite the passions of the jurors against the
        accused, the general rule does not apply." *Garner v. State*, 78 Nev. 366,
23      372–73, 374 P.2d 525, 529 (1962) (citations omitted).

24           *Garner* further stated, "[i]f the issue of guilt or innocence is close, if
        the state's case is not strong, prosecutor misconduct will probably be
25      considered prejudicial." *Id.* at 374, 374 P.2d at 530; *cf. Lay v. State*, 110
        Nev. 1189, 1194, 886 P.2d 448, 451 (1994) ("[W]here evidence of guilt is
26      overwhelming, prosecutorial misconduct may be harmless error.").

27

28

                                        18

*1. Guilt phase*

\*    \*    \*

During rebuttal closing argument, the prosecutor referred to negotiations he had with Melcher and Evans before they pled guilty to lesser charges. Lisle argues that the prosecutor improperly injected his opinion or personal beliefs into his argument, tendered his own credentials, and vouched for the credibility of government witnesses.

It is improper for the prosecution to vouch for the credibility of a government witness. Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony.

*United States v. Roberts*, 618 F.2d 530, 533 (1980).

"Analysis of the harm caused by vouching depends in part on the closeness of the case." *U.S. v. Frederick*, 78 F.3d 1370, 1378 (9th Cir.1996); *see also Roberts* at 534 (improper to imply that a witness not called could support a chief witness's testimony).

In the present case, the credibility of both Melcher and Evans was critical. The prosecutor did appear to refer to information known by him but not presented to the jury as to the content of the negotiations between himself and Melcher, and himself and Evans. Moreover, the prosecutor's statements may have suggested that the prestige of the government was behind the witnesses. However, the prosecutor did not make any affirmative misrepresentations; the fact of his negotiations with Melcher and with Evans was in evidence, and Melcher and Evans were cross-examined about these negotiations.

\*    \*    \*

*2. Rebuttal penalty phase argument*

Lisle contends that the prosecutor improperly suggested to the jury that it align itself with the prosecution by referring to "we" and "us".

For the most part, the prosecutor's use of "we" and "us" is rhetorical, and therefore not improper. However, the statement, "There is only one human being in this world that causes us to be here today doing this terrible thing we have to do. And his name is Kevin Lisle," improperly suggests that the jury is aligned with the prosecution.

\*    \*    \*

We conclude that several of the prosecutor's remarks were improper, but we further conclude that none was patently prejudicial and none would have affected the jury verdict.

*Lisle*, 113 Nev. at 552–54, 937 P.2d at 480–82.

Prosecutorial misconduct rises to the level of a constitutional violation only where it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted); *see also Parker v. Matthews*, 567 U.S. 37, 45 (2012) ("The 'clearly established Federal law' relevant here is our decision in [*Darden*], which explained that a prosecutor's improper comments will be held to violate the Constitution only if they '"so infected the trial with unfairness as to make the resulting conviction a denial of due process."'" (quoting *Darden*, 477 U.S. at 181, and *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974))); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (citation omitted). Arguments of counsel must be viewed in the context of the entire trial. *See Boyde v. California*, 494 U.S. 370, 384–85 (1990); *Greer v. Miller*, 483 U.S. 756, 765–66 (1987). In essence, determining whether a defendant's trial was "fair" is "equivalent to evaluating whether there was a reasonable probability of a different result." *Hein v. Sullivan*, 601 F.3d 897, 914–15 (9th Cir. 2010); *see also Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2016).

Regarding Lisle's claim in Claim 2B2a that the prosecution improperly aligned itself with the jury by using pronouns such as "we" and "us," the Court determines that it was reasonable for the Nevada Supreme Court to conclude that the prosecutors' use of such plural first-person pronouns in argument was, for the most part, rhetorical and not improper, and, to the extent it could be considered improper, it was not prejudicial. *See United States v. Younger*, 398 F.3d 1179, 1190–91 (9th Cir. 2005) (prosecutor's repeated use of phrase "we know" in closing argument was not improper and did not materially affect fairness of trial). Those arguments by the prosecutor did not so infect the trial with unfairness as to make Lisle's conviction or sentence a denial of due process. *See Darden*, 477 U.S. at 181. This Court also determines that it was

reasonable for the Nevada Supreme Court to conclude that, while it may have been improper for the prosecutor to align himself with the jury by arguing "[t]here is only one human being in this world that causes us to be here today doing this terrible thing we have to do … [a]nd his name is Kevin Lisle," that single statement did not infect Lisle's trial with unfairness so as to render his sentence unconstitutional. *See id.*

Regarding Claim 2B2b, the Court determines that the Nevada Supreme Court did not rule unreasonably in concluding that, while the credibility of both Melcher and Evans was critical, while the prosecutor could be understood to suggest that he had information about the State's negotiations with Melcher and Evans that was not presented to the jury, and while the prosecutor could be viewed as placing the prestige of the government behind those witnesses, the comments at issue did not render Lisle's trial unfair. As the Nevada Supreme Court noted, the prosecutor did not make any affirmative misrepresentations. And, as the Nevada Supreme Court also noted, the fact of the negotiations with Melcher and with Evans was in evidence, and Melcher and Evans were cross-examined about the negotiations. In the context of the entire prosecution arguments, and in the context of the trial as a whole, this Court cannot say that the Nevada Supreme Court's denial of relief on this claim was erroneous beyond any fairminded disagreement. *See Harrington*, 562 U.S. at 101.

Turning to Claim 5C, Lisle claims that his constitutional rights were violated because his trial counsel were ineffective for failing to object to the prosecutorial misconduct alleged in Claims 2B2a and 2B2b. *See* Third Amended Petition (ECF No. 197), pp. 159–60; *see also* Order entered July 2, 2018 (ECF No. 260), pp. 34–36.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two-prong test for claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

21

*Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 994–95 (2010) (double deference required with respect to state court adjudications of *Strickland* claims).

In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See Strickland*, 466 U.S. at 697.

1    Lisle asserted this claim of ineffective assistance of counsel in his state habeas

2 action. Supplemental Points and Authorities, Exh. 84, pp. 34–38 (ECF No. 219-23,

3 pp. 35–39) (petition); Appellant's Amended Opening Brief, Exh. 70, pp. 29–33 (ECF No.

4 219-9, pp. 36–40) (brief on appeal)). On the appeal in that action, the Nevada Supreme

5 Court ruled on the claim as follows:

6        Lisle first argues that trial counsel rendered constitutionally
         ineffective assistance by failing to object to several statements by the
7        prosecutor. Claims of ineffective assistance of counsel are evaluated
         under the two-part test set forth in *Strickland v. Washington*.
8
                                    *   *   *
9
         In his guilt phase rebuttal closing argument, the prosecutor
10       referenced negotiations he had with two of the State's witnesses before
         they pleaded guilty to lesser charges. On direct appeal, Lisle argued that
11       the prosecutor improperly injected his personal opinion of their culpability,
         tendered his credentials, and vouched for these witnesses. We concluded
12       that none of the prosecutor's remarks warranted reversal of appellant's
         conviction and sentence. Lisle now claims that his trial counsel was
13       ineffective for not objecting to the prosecutor's dialogue. Although counsel
         should have objected, it is unlikely that an objection would have changed
14       the jury's verdict. [Footnote: *See Howard v. State*, 106 Nev. 713–14, 719,
         800 P.2d 175, 179 (1990), *abrogated on other grounds by Harte v. State*,
15       116 Nev. 1054, 13 P.3d 420 (2000).] The district court properly denied
         relief on this ground.
16
         Lisle next argues that trial counsel provided ineffective assistance
17       by failing to object to the prosecutor's use of the words "we" and "us" in his
         penalty phase closing argument. Lisle asserts that this court refused to
18       address the propriety of these statements because his trial counsel did not
         object.
19
         Contrary to Lisle's assertion, this court did evaluate the
20       prosecutor's use of the words "we" and "us." We determined that:

21           For the most part, the prosecutor's use of "we" and "us" is
             rhetorical, and therefore not improper. However, the
22           statement, "There is only one human being in this world that
             causes us to be here today doing this terrible thing we have
23           to do. And his name is Kevin Lisle," improperly suggests that
             the jury is aligned with the prosecution.
24
         Again, trial counsel should have objected to the prosecutor's improper
25       statement. [Footnote: *See Howard*, 106 Nev. at 719, 800 P.2d at 179.]
         Nevertheless, we determined that this improper statement did not
26       prejudice Lisle. The district court properly denied relief on this ground.

27 Order of Affirmance, Exh. 103, pp. 1–3 (ECF No. 220-12, pp. 2–4) (footnotes omitted).

28 This ruling was reasonable. A fairminded jurist could conclude that there is no

1   reasonable probability that, had trial counsel objected to the prosecutors' arguments,

2   the result of Lisle's trial would have been different. *See Harrington*, 562 U.S. at 101;

3   *Strickland*, 466 U.S. at 688, 694.

4         In his motion for an evidentiary hearing, Lisle requests an evidentiary hearing

5   regarding this claim of ineffective assistance of counsel. *See* Motion for Evidentiary

6   Hearing (ECF No. 273), pp. 5–6. Lisle states:

7             Lisle respectfully moves this Court to allow an evidentiary hearing
           regarding this claim, so this Court can consider the contested factual
8          matter of counsel's deficient performance with an adequately developed
           record.
9

10  *Id.* at 6. However, this Court's resolution of Claim 5C does not turn on the question

11  whether counsel's performance was deficient. The Nevada Supreme Court ruled that,

12  even if counsel's performance was deficient, Lisle was not prejudiced, and this Court

13  determines that ruling was reasonable within the meaning of 28 U.S.C. § 2254(d). An

14  evidentiary hearing on the question whether counsel's performance was deficient is

15  unwarranted.

16        In sum, the Court determines that the Nevada Supreme Court's rulings denying

17  relief on Claims 2B2a, 2B2b, and the remaining part of Claim 5, were not contrary to, or

18  an unreasonable application of, *Darden, Strickland*, or any other United States Supreme

19  Court precedent, and were not based on an unreasonable determination of the facts in

20  light of the evidence. The Court will deny Lisle habeas corpus relief on these claims.

21        **C.    Claim 7**

22        In Claim 7, Lisle claims that his death sentence violates the federal constitution

23  "because the knowing risk of death aggravating circumstance has been

24  unconstitutionally applied to Mr. Lisle's case." Third Amended Petition (ECF No. 197),

25  pp. 174–80. The aggravating circumstance at issue in this claim applies where "[t]he

26  murder was committed by a person who knowingly created a great risk of death to more

27  than one person by means of a weapon, device or course of action which would

28  normally be hazardous to the lives of more than one person." Nev. Rev. Stat.

1   200.033(3). This was the only alleged aggravating circumstance presented to the jury.

2   The jury was instructed regarding the aggravating circumstance using the language of

3   the statute, as follows:

> You are instructed that the following factors are circumstances by which Murder of the First Degree may be aggravated:
>
> 1.   The murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person.

8   Jury Instruction No. 8, Exh. 48, p. 1967 (ECF No. 218-13, p. 10). The jury found this

9   aggravating circumstance to be established beyond a reasonable doubt. Special

10  Verdict, Exh. 52, p. 1991 (ECF No. 218-17, p. 2).

11     Lisle asserted this claim on his direct appeal. *See* Appellant's Amended Opening

12  Brief, Exh. 70, pp. 73–79 (ECF No. 219-9, pp. 87–93). The Nevada Supreme Court

13  ruled as follows:

> *Whether the district court committed reversible error when it allowed the jury to consider as an aggravating circumstance that the murder was committed by a person who knowingly created a great risk of death to more than one person.*
>
> Lisle argues that the district court applied NRS 200.033(3) in an overly broad manner, violating the Constitution. Lisle contends that this aggravator fails because there was insufficient evidence to indicate (1) that at the time the single shot was fired he knew there was a passenger in the vehicle, and (2) that the single shot placed another person at great risk of death.
>
> First, Lisle contends that there was insufficient evidence to indicate that he knew Logan had a passenger. Evans testified that he did not see a passenger in the Mustang. However, Gonzales was able to see the front and rear passengers in the van.
>
> Second, Lisle contends that "a great risk of death to more than one person" requires a high probability of harm to others, not a mere possibility of harm. He cites a number of cases from Florida and Georgia to support his argument that a high probability of harm to others was not present here.
>
> In *Nevius v. State*, 101 Nev. 238, 699 P.2d 1053 (1985), the defendant knowingly created a great risk of death to more than one person where the victim's wife was in the line of fire. *Id.* at 243, 699 P.2d at 1056.

1
2

       In the instant case, Lisle fired his revolver at Logan from a fairly close range while the two vehicles were moving. Unlike *Nevius*, Gonzales was not between Lisle and Logan, but he was sitting just beyond Logan, the target.

3
4

       We conclude that sufficient evidence supports the finding of this aggravating circumstance, and its application in this context is not overbroad.

5    *Lisle*, 113 Nev. at 555–56, 937 P.2d at 482–83 (footnote omitted).

6        Lisle then asserted the claim again in his first state habeas action. *See*

7    Supplemental Points and Authorities, Exh. 84, pp. 41–45 (ECF No. 219-23, pp. 42-46).

8    The state district court denied relief. *See* Findings of Fact, Conclusions of Law and

9    Order, Exh. 91, pp. 2–4 (ECF No. 220, pp. 3–5). Lisle then asserted the claim on the

10    appeal in that action. *See* Appellant's Opening Brief, Exh. 99, pp. 36–44 (ECF No. 220-

11    8, pp. 43–51). The Nevada Supreme Court ruled as follows:

12        *Aggravating circumstance*

13
14
15
16

       Lisle argues, as he did on direct appeal, that the evidence does not support the jury's finding that he "knowingly created a great risk of death to more than one person." [Footnote: NRS 200.033(3)] He claims his case is indistinguishable from *Leslie v. State* [Footnote: 114 Nev. 8, 952 P.2d 966 (1998)], in which this court found that the record did not support the jury's finding of the aggravator, and therefore this court should strike his aggravator.

17
18
19
20
21
22
23
24
25

       We conclude that Lisle is not entitled to relief on this ground. First, we determined that the aggravator was supported by sufficient evidence on direct appeal, and that decision is now law of the case. [Footnote: *Hall v. State*, 91 Nev. 314, 535 P.2d 797 (1975).] Moreover, *Leslie* is inapplicable. In *Leslie*, the State based the "knowingly created a great risk of death to more than one person" aggravator on Leslie shooting the gun into the wall above the head of the victim. There was a back room behind that wall, in which two additional people were located. There was no evidence that Leslie knew that the two people were there. In this case, Lisle shot into a vehicle traveling approximately 60 miles per hour on a freeway. He argues that his case is like Leslie because there is no evidence that he or the other van passengers could see the victim's passenger. However, that passenger testified that he could see the van passengers. Moreover, Lisle shot the driver of a vehicle traveling on a freeway. Killing the driver of a vehicle that is traveling on a freeway puts others at great risk of death. Therefore, we conclude that the district court properly denied relief on this claim.

26    Order of Affirmance, Exh. 103, pp. 5–6 (ECF No. 220-12, pp. 6–7).

27        Any question regarding the interpretation of a state-law aggravating factor or its

28    application to the facts of a particular case—absent alleged violation of the petitioner's

1   federal constitutional rights—is a matter of state law, beyond the scope of federal

2   habeas corpus. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In *Lewis v. Jeffers*,

3   Court stated:

> Because federal habeas corpus relief does not lie for errors of state law,
> *see*, *e.g.*, *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d
> 29 (1984); *Rose v. Hodges*, 423 U.S. 19, 21–22, 96 S.Ct. 175, 177–178,
> 46 L.Ed.2d 162 (1975) (*per curiam*), federal habeas review of a state
> court's application of a constitutionally narrowed aggravating circumstance
> is limited, at most, to determining whether the state court's finding was so
> arbitrary or capricious as to constitute an independent due process or
> Eighth Amendment violation. *Cf. Donnelly v. DeChristoforo*, 416 U.S. 637,
> 642, 643, 94 S.Ct. 1868, 1871, 1871, 40 L.Ed.2d 431 (1974) (absent a
> specific constitutional violation, federal habeas review of trial error is
> limited to whether the error "so infected the trial with unfairness as to
> make the resulting conviction a denial of due process").

11  *Id.* The Supreme Court concluded that the appropriate standard of federal habeas

12  review of a state court's application of an aggravating circumstance is the "rational

13  factfinder" test: "whether, after viewing the evidence in the light most favorable to the

14  prosecution, any rational trier of fact could have found the essential elements" of the

15  aggravating factor. *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

16      Lisle claims that there was insufficient evidence presented at trial to support

17  application of this aggravating circumstance; specifically, Lisle claims there was

18  insufficient evidence that he *knowingly* created a great risk of death to more than one

19  person. Third Amended Petition, pp. 174–75, 179 (citing *Jackson*). This Court

20  determines that Lisle's claim is without merit.

21      First, as the Nevada Supreme Court pointed out, there was evidence that, when

22  Lisle shot Logan, Lisle could see that there was a passenger in the car. *See* Trial

23  Transcript, October 16, 1995, Exh. 37B, pp. 194, 199–201, 210–16 (ECF No. 218-2, pp.

24  60, 65–67, 76–82) (Gonzales, the passenger in the car, testified that he saw two

25  passengers in the van that Lisle was in, one of whom was the shooter, indicating that

26  there was a line of sight for the shooter to see Gonzales). A rational juror could have

27  found, based on this evidence, that Lisle could see the passenger, and that he therefore

28

1  knowingly created a great risk of death to more than one person when he shot the driver
2  of the car in the head.

3  But furthermore, even assuming (for purposes of this analysis only) that the
4  evidence that Lisle could see Gonzales was not, by itself, sufficient to support the
5  finding that Lisle knowingly created a great risk of death to more than one person, there
6  was still sufficient evidence to support that finding: when Lisle shot Logan in the head,
7  Logan was driving a car at about 60 miles per hour on a Las Vegas freeway at 9:00 to
8  10:30 in the evening. *See*, *id.* at 188–89 (ECF No. 218-2, pp. 54–55) (testimony of
9  Gonzales regarding time and place of shooting); *id.* at 196 (ECF No. 218-2, p. 62
10  (testimony of Gonzales that car was traveling at 60 to 65 miles per hour); Trial
11  Transcript, October 17, 1995, Exh. 38, p. 314 (ECF No. 218-3, p. 40) (testimony of
12  Evans regarding time of shooting). In this Court's view, whether or not Lisle knew that
13  there was a passenger in Logan's car, a rational juror could find that one who shoots
14  the driver of a car in the head, when the car is traveling at about 60 miles per hour on a
15  Las Vegas freeway at 9:00 to 10:30 p.m., knowingly creates a great risk of death to
16  more than one person.

17  The Nevada Supreme Court's ruling that there was sufficient evidence to support
18  the aggravating circumstance that Lisle knowingly created a great risk of death to more
19  than one person was reasonable in light of the evidence presented at trial.

20  Moreover, supported by this evidence, the aggravating circumstance was not
21  applied in an arbitrary manner, and it properly functioned to narrow the class of persons
22  eligible for the death penalty. *See Zant v. Stephens*, 462 U.S. 862, 876 (1983) (finding
23  of aggravating circumstance "must genuinely narrow the class of persons eligible for the
24  death penalty and must reasonably justify the imposition of a more severe sentence on
25  the defendant compared to others found guilty of the murder"); *see also Buchanan v.*
26  *Angelone,* 522 U.S. 269, 275–76 (1998); *Tuilaepa v. California*, 512 U.S. 967, 971
27  (1994). Lisle has not cited any United States Supreme Court precedent holding to the
28  contrary.

1    The Nevada Supreme Court's ruling on this claim was not contrary to, or an

2   unreasonable application of, United States Supreme Court precedent, and it was not

3   based on an unreasonable determination of the facts in light of the evidence. The Court

4   will deny Lisle habeas corpus relief on Claim 7.

5       **D.   Claim 10A**

6        In Claim 10A, Lisle claims that his federal constitutional rights were violated

7   because, in the penalty phase of his trial, the trial court erroneously allowed the State to

8   present prejudicial evidence of an unadjudicated homicide, the Lusch murder. Third

9   Amended Petition (ECF No. 197), pp. 188–90. Lisle's claim, in its entirety, is as follows:

> 1. The trial court erroneously allowed the State to present prejudicial evidence of an unrelated and unadjudicated homicide during the penalty phase of Mr. Lisle's trial. *See* [Trial Transcript, October 24, 1995, Exh. 45, pp. 81–196 (ECF No. 218-10, pp. 82–197)] (detailing testimony connecting Mr. Lisle to the death of Justin Lusch). Evidence of other crimes may be admitted in a penalty hearing only after the State has proven aggravating circumstances beyond a reasonable doubt and the jury has weighed them against mitigation. *See Evans v. State*, 28 P.3d 498, 515 (Nev. 2001). A contrary result would undermine the Eighth Amendment's guarantees of reliability and proportionality. *Evans*, 28 P.3d at 515.

> 2. The use of unadjudicated criminal misconduct, not reduced to a conviction, in the penalty phase of trial violated petitioner's right to due process of law and a reliable sentence. In order for the penalty jury to consider such evidence it must first decide whether or not the misconduct actually occurred and whether the defendant committed it. No jury that has just convicted a defendant of first degree murder could possibly remain impartial for the purpose of determining whether the defendant in fact committed the misconduct, or could make a constitutionally reliable determination of that issue. Accordingly, the use of such evidence in Mr. Lisle's penalty phase violated federal due process guarantees and the Eighth Amendment guarantee of a reliable sentence. *See State v. Bartholomew*, 683 P.2d 1079, 1085–86 (Wash. 1984); *cf. Lisle v. State*, 937 P.2d 473, 484 (1997). In the alternative, Mr. Lisle's rights to due process and to a reliable sentence under the federal constitution were violated by the failure of the district court to bifurcate the death-eligibility phase from the rest of the penalty hearing. Under Nevada law, a jury must make the initial determination of a defendant's death-eligibility by weighing only the statutory aggravating factors—here, only the weak or non-existent great risk of death factor—against all the mitigating evidence. The non-statutory aggravating evidence, which in this case included the allegation of another murder, cannot play any part in the eligibility weighing process.

> 3. The Nevada Supreme Court rejected this claim on the ground that jurors are presumed to be able to follow the jury instructions, which in general terms described the sentencing calculus. *Lisle v. State*, 113 Nev.

at 557–558; *see also Summers v. State*, 148 P.3d 778, 783–84 (2006) (bifurcation of penalty phase not required because jury presumed to follow instructions). But no jury could follow such an instruction in this case. The State's arguments in the penalty phase repeatedly referred to the other alleged homicide, and the nature of another homicide allegation is such that its improper effect on the eligibility determination could not be avoided, under the federal due process and reliability guarantees, evidence that is too prejudicial must be excluded in the penalty phase. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (inflammatory victim impact evidence). Here, the allegation of the other homicide was so inflammatory that no rational juror could ignore it in making the eligibility determination, and the only way to avoid that prejudicial effect would have been by separating the death-eligibility determination and conducting that part of the hearing without reference to the unadjudicated homicide. The failure to take that protective action rendered the penalty hearing fundamentally unfair and resulted in an unreliable sentence in violation of the federal constitution.

*Id.*

Lisle asserted such a claim on his direct appeal, and the Nevada Supreme ruled as follows:

> *Whether prejudicial error occurred when the jury was instructed on the appropriate use of the character evidence presented by the prosecution during the penalty phase.*
>
> Lisle argues that the jury instructions during the penalty phase were ambiguous and led the jury to rely improperly on his character and his unadjudicated murder charge in finding him death-eligible. Lisle contends that nothing prevented the jury from considering character evidence along with aggravating and mitigating evidence in arriving at the death penalty option. He argues that the evidence presented by the State at the penalty hearing was solely evidence of his bad character, and the jury should have been instructed not to consider this evidence until after it weighed the aggravating and mitigating circumstances.
>
> When a sentencing body is given discretion to impose the death sentence, "that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (Opinion of Stewart, Powell, and Stevens, JJ.), *reh'g denied*, 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). In *Gallego v. State*, this court explained the process by which a Nevada jury arrives at a sentence of death. 101 Nev. 782, 711 P.2d 856 (1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 246, 93 L.Ed.2d 171 (1986) (where jury was instructed not to consider evidence of uncharged homicides as aggravating circumstance, such evidence was relevant to the considerations of defendant's death worthiness). "Individuals who are identified as potential recipients of the death penalty because of conduct statutorily defined as an aggravating circumstance must then be scrutinized according to their individual characteristics." 101 Nev. at 791, 711 P.2d at 862.

In the present case, the jury was clearly instructed that it must find an aggravating circumstance before the death penalty was an option, and the aggravator was defined. Instruction 8B clearly states that evidence of other crimes is not to be considered as an aggravator. [Footnote: Penalty phase instruction 8B reads: The State has alleged one statutory aggravating circumstance against Kevin Lisle. Other arrests, convictions, or pending charges against Mr. Lisle are to be considered for character only and not as aggravating circumstances.] We conclude that the instructions to the jury regarding the use of character evidence minimized the risk of arbitrary and capricious action, and no prejudicial error occurred.

*Whether the trial court committed prejudicial error when it allowed the State to present to the jury evidence concerning an unadjudicated murder case during the penalty hearing.*

Lisle argues that the district court erred by allowing the State to present evidence concerning an unadjudicated murder case before the jury advised the court that it had found an aggravating circumstance beyond a reasonable doubt. Lisle contends that because this evidence was presented in conjunction with aggravating and mitigating circumstances, the district court had no way of determining whether the aggravator was found. Moreover, Lisle contends that the evidence is prejudicial and unreliable. He argues that introduction of the evidence prior to establishing that the jury found the aggravating circumstance beyond a reasonable doubt violated his right against cruel and unusual punishment and his right to due process.

The district court has broad discretion to admit evidence at a penalty hearing for first-degree murder under NRS 175.552. In *Riker v. State*, 111 Nev. 1316, 905 P.2d 706 (1995), *cert. denied*, 517 U.S. 1194, 116 S.Ct. 1687, 134 L.Ed.2d 788 (1996), this court stated, "evidence of uncharged crimes may be admitted during a penalty hearing only after any aggravating circumstances have been established beyond a reasonable doubt." *Id.* at 1326, 905 P.2d at 712, citing *Guy v. State*, 108 Nev. 770, 782, 839 P.2d 578, 586 (1992). This court then explained that "it does not necessarily follow that the trier of fact cannot hear the evidence of uncharged crimes before it considers the aggravating circumstances, only that the uncharged crimes cannot be used to prove the aggravating circumstances." *Id.* at 1327, 905 P.2d at 713.

In the present case, evidence of the uncharged homicide was presented before the jury submitted its decision regarding the aggravating circumstance. The jury was instructed not to consider other crimes or pending charges as aggravating circumstances. There is a presumption that jurors follow jury instructions. *Tennessee v. Street*, 471 U.S. 409, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985). Accordingly, we conclude that the district court did not err in allowing the State to present evidence of the unadjudicated murder before the jury advised the court that it had found an aggravating circumstance beyond a reasonable doubt.

*Lisle*, 113 Nev. at 556–58, 937 P.2d at 483–84.

As the Court reads Claim 10A, Lisle makes two distinct claims. The first is that, because he had not yet been convicted of the Lusch murder, the evidence of his

1  participation in that murder, presented in the penalty phase of his trial in this case, was

2  unreliable. *See* Third Amended Petition (ECF No. 197), pp. 188–89 ("No jury that has

3  just convicted a defendant of first degree murder could possibly remain impartial for the

4  purpose of determining whether the defendant in fact committed the misconduct, or

5  could make a constitutionally reliable determination of that issue."). Lisle made a similar

6  argument on his direct appeal. *See* Appellant's Amended Opening Brief, Exh. 70,

7  pp. 83–88 (ECF No. 219-9, pp. 97–102). The Nevada Supreme Court rejected this

8  argument without discussion or analysis specific to it. *See Lisle*, 113 Nev. at 557–58,

9  937 P.2d at 484. Lisle, however, cites no United States Supreme Court precedent in

10  support of this argument. *See* 28 U.S.C. § 2254(d). The Court determines that the

11  Nevada Supreme Court's rejection of this argument was not inconsistent with Supreme

12  Court precedent.

13      Second, Lisle argues that it was constitutional error for the trial court to admit

14  evidence of Lisle's participation in the Lusch murder before the jury found an

15  aggravating circumstance. *See* Third Amended Petition (ECF No. 197), pp. 188–90. In

16  other words, as the Court understands Lisle's claim here, he argues that it was error for

17  the trial court not to bifurcate the penalty phase of the trial (already bifurcated from the

18  guilt phase) into a death-eligibility phase and a determination-of-sentence phase. *See*

19  *id.* But, here again, Lisle cites no United States Supreme Court precedent requiring as

20  much. *See* 28 U.S.C. § 2254(d). The Nevada Supreme Court ruled that the instructions

21  given the jury properly channeled their consideration of the evidence, such that they

22  were instructed to make the death-eligibility determination before considering the other-

23  misconduct evidence. *See Lisle*, 113 Nev. at 556–58, 937 P.2d at 483–84. This was

24  supported by the record. *See* Instruction 7, Exh. 48, pp. 1965–66 (ECF No. 218-13,

25  pp. 8–9); Instruction 8B, Exh. 48, p. 1969 (ECF No. 218-13, p. 12). The Nevada

26  Supreme Court also cited the well-established rule that jurors are presumed to follow

27  jury instructions. *See Lisle*, 113 Nev. at 558, 937 P.2d at 484, citing *Tennessee v.*

28  *Street*, 471 U.S. 409, 415 (1985); *see also*, *e.g.*, *Penry v. Johnson*, 532 U.S. 782, 799

1   (2001); *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S.

2   200, 211 (1987).

3   The Nevada Supreme Court's ruling on the claims in Claim 10A was not contrary

4   to, or an unreasonable application of, United States Supreme Court precedent, and it

5   was not based on an unreasonable determination of the facts in light of the evidence.

6   The Court will deny Lisle habeas corpus relief on Claim 10A.

7   **E.   Claim 15**

8   In Claim 15, Lisle claims that his conviction and death sentence violate the

9   federal constitution "because he may become incompetent to be executed." Third

10  Amended Petition (ECF No. 197), p. 261. Lisle's claim, in its entirety, is as follows:

11          1. Mr. Lisle does not, at this time, assert that he is incompetent to
            be executed. Mr. Lisle alleges that he may become incompetent before
12          the execution is carried out.

13          2. Under authority in this Circuit, *see Martinez-Villareal v. Stewart*,
            118 F.3d 628 (9th Cir. 1997), *aff'd* 523 U.S. 637 (1998), it appears that a
14          claim anticipating incompetence to be executed should be raised in an
            initial petition for writ of habeas corpus.
15
            3. Mr. Lisle therefore asserts the allegations of this claim pursuant
16          to *Martinez-Villareal* in order to avoid any possible implication of waiver of
            this claim.
17

18  *Id.*

19  In *Ford v. Wainwright*, 477 U.S. 399, 409–10 (1986), the Supreme Court held

20  that it is a violation of the Eighth Amendment to execute one who is unable to

21  comprehend that his execution is based on a conviction for murder. However, for

22  purposes of a *Ford* claim, the determination whether the petitioner is incompetent

23  cannot be made until an execution warrant is issued, making his execution imminent.

24  *See Martinez-Villareal v. Stewart*, 118 F.3d 628, 630 (9th Cir. 1997) (citing *Herrera v.*

25  *Collins*, 506 U.S. 390, 406 (1993)).

26  Respondents argue in their answer that this claim is not ripe, and should be

27  dismissed on that ground, because Lisle's execution is not now imminent. *See* Answer

28

1     (ECF No. 263), pp. 38–39. Lisle did not respond to that argument. *See* Reply (ECF No.

2     271). Claim 15 is not ripe, and it will be dismissed on that ground.

3          **F.     Claim 21B**

4          In Claim 21B, Lisle claims that lethal injection, as it would be carried out in his

5     case, in Nevada, would violate the federal constitution. Third Amended Petition (ECF

6     No. 197), pp. 318–35.

7          Respondents argue that this claim, too, is unripe. *See* Answer (ECF No. 263),

8     pp. 39–40. The Court agrees. This claim is not ripe because it is impossible at this time

9     to know what Nevada's lethal execution protocol will be when Lisle's execution

10    becomes imminent. *See Floyd v. Filson*, 949 F.3d 1128, 1152–53 (9th Cir. 2020) ("We

11    cannot determine what drugs Nevada might attempt to use to execute Floyd, and we

12    cannot adjudicate the constitutionality of an unknown protocol."); *see also Beardslee v.*

13    *Woodford*, 395 F.3d 1064, 1069–70 (9th Cir. 2005) ("[T]he precise execution protocol is

14    subject to alteration until the time of execution."); *see also Thomas v. Union Carbide*

15    *Agric. Prod. Co.*, 473 U.S. 568, 580 (1985) (Ripeness is "peculiarly a question of

16    timing;" its "basic rationale is to prevent the courts, through premature adjudication, from

17    entangling themselves in abstract disagreements." (internal quotation marks and

18    citations removed)). Claim 21B will be dismissed on the ground that it is not ripe.

19         **G.     Claim 8**

20         In Claim 8, Lisle claims that his conviction and death sentence violate the federal

21    constitution because of cumulative error. Third Amended Petition (ECF No. 197),

22    pp. 181–82.

23         As is explained above, regarding Claims 2B2a and 2B2b the Court determines

24    that the prosecution may have committed misconduct by making improper arguments,

25    but the Nevada Supreme Court reasonably ruled that the prosecutors' comments were

26    not prejudicial in that they did not render Lisle's trial unfair. And, regarding the related

27    claim of ineffective assistance of trial counsel in Claim 5C, the Court determines that the

28    Nevada Supreme Court reasonably ruled that there is no reasonable probability that,

1   had trial counsel objected to the prosecutors' arguments, the result of Lisle's trial would

2   have been different. Therefore, regarding these claims the Court determines that there

3   was no constitutional error. This conclusion is the same whether Claims 2B2a, 2B2b

4   and 5C are considered separately or cumulatively.

5           Beyond Claims 2B2a, 2B2b and 5C, the Court finds there to be no other error—

6   or possible error—to be considered under this cumulative error claim.

7           The Court will deny Lisle habeas corpus relief on Claim 8.

8           **H.      Motion for Evidentiary Hearing**

9           In his motion for evidentiary hearing (ECF No. 273), Lisle requests an evidentiary

10  hearing regarding the question whether his trial counsel's performance was deficient as

11  alleged in his claim of ineffective assistance of trial counsel in Claim 5C, and regarding

12  his claim in Claim 21B that Nevada's lethal injection protocol in unconstitutional. The

13  Court determines that an evidentiary hearing is unwarranted with respect to those

14  claims. As for Claim 5C, as explained above, this Court's resolution of that claim does

15  not turn on the question whether counsel's performance was deficient, but rather, this

16  Court determines that the Nevada Supreme Court reasonably ruled that, even if

17  counsel's performance was deficient, Lisle was not prejudiced. And, as for Claim 21B,

18  the Court determines that claim is not ripe. An evidentiary hearing is not warranted on

19  either of those claims. The Court will deny Lisle's motion for an evidentiary hearing.

20          **I.      Certificate of Appealability**

21          The standard for the issuance of a certificate of appealability requires a

22  "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The

23  Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

24              Where a district court has rejected the constitutional claims on the
            merits, the showing required to satisfy § 2253(c) is straightforward: The
25          petitioner must demonstrate that reasonable jurists would find the district
            court's assessment of the constitutional claims debatable or wrong. The
26          issue becomes somewhat more complicated where, as here, the district
            court dismisses the petition based on procedural grounds. We hold as
27          follows: When the district court denies a habeas petition on procedural
            grounds without reaching the prisoner's underlying constitutional claim, a
28          COA should issue when the prisoner shows, at least, that jurists of reason

1
2

> would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

3   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074,

4   1077–79 (9th Cir. 2000).

5        Applying the standard articulated in *Slack*, the Court finds that a certificate of

6   appealability is warranted with respect to Claim 2B2b and the claim in Claim 5C that

7   Lisle's trial counsel was ineffective for failing to object to the prosecutorial misconduct

8   alleged in Claim 2B2b. The Court will grant Lisle a certificate of appealability with regard

9   to those claims. Beyond that, the Court will deny Lisle a certificate of appealability.

10  **IV.    Conclusion**

11       **IT IS THEREFORE HEREBY ORDERED** that Petitioner's Motion for Evidentiary

12  Hearing (ECF No. 273) is **DENIED**.

13       **IT IS FURTHER ORDERED** that Claims 15 and 21B of Petitioner's Third

14  Amended Petition for Writ of Habeas Corpus (ECF No. 197) are **DISMISSED**, as those

15  claims are not ripe.

16       **IT IS FURTHER ORDERED** that Petitioner's Third Amended Petition for Writ

17  of Habeas Corpus (ECF No. 197) is **DENIED**.

18       **IT IS FURTHER ORDERED** that Petitioner is granted a certificate of appealability

19  with respect to Claim 2B2b and the claim in Claim 5C that Lisle's trial counsel was

20  ineffective for failing to object to the prosecutorial misconduct alleged in Claim 2B2b.

21  With respect to all other issues, the Court denies Petitioner a certificate of appealability.

22       **IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter

23  judgment accordingly.

24

25       DATED September 8, 2021.

26

27  _____

28  JAMES C. MAHAN,
    UNITED STATES DISTRICT JUDGE